## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CURTIS BAILEY #290352**                    **CIVIL ACTION**

**versus**                                            **NO. 06-839**

**BURL CAIN, WARDEN, ANGOLA**              **SECTION: "K" (1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Curtis Bailey, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On April 27, 1995, he was found guilty of one count of racketeering, seven counts of attempted possession of cocaine, one count of distribution of cocaine, and one count of attempted distribution of cocaine in violation of Louisiana law.[2]  On May 31, 1995, he was sentenced on the conviction for racketeering to a term of fifty years imprisonment, on each of the convictions for attempted possession of cocaine to a term of two and one-half years imprisonment, on the conviction for distribution of cocaine to a term of thirty years imprisonment, and on the conviction for attempted distribution of cocaine to a term of fifteen years imprisonment. It was ordered that his sentences run concurrently and that he be given credit for time served.[3]  On February 29, 1996, petitioner was found to be a second offender and was resentenced as such on the racketeering conviction to a term of fifty years imprisonment, without benefit of probation or suspension of sentence, with credit for time served.[4]  On April 28, 1998, the Louisiana Fifth Circuit Court of Appeal "conditionally affirmed" his convictions, multiple offender adjudication, and sentences.  However, the Court of Appeal ordered:

> [T]he case is remanded for the trial court to conduct an evidentiary hearing on defendant's claim that the jury verdict was tainted by unauthorized communications to the jurors, reserving to the trial court the authority to grant a new trial if deemed necessary and

---

[2] State Rec., Vol. XVIII of XX, transcript of April 27, 1995, p. 78; State Rec., Vol. I of XX, minute entry dated April 27, 1995; State Rec., Vol. I of XX, jury verdict form.

[3] State Rec., Vol. XVIII of XX, transcript of May 31, 1995; State Rec., Vol. II of XX, minute entry dated May 31, 1995.

[4] State Rec., Vol. IX of XX, transcript of February 29, 1996; State Rec., Vol. III of XX, minute entry dated February 29, 1996.

> reserving to defendant the right to appeal any adverse ruling following the hearing.[5]

On October 30, 1998, the Louisiana Supreme Court denied a related writ application.[6]

While that Louisiana Supreme Court writ application was pending, the state district court held the evidentiary hearing on June 19, 1998, as ordered by the Court of Appeal. After questioning the original jurors, the trial court held that the communications in question were harmless. Although defense counsel indicated that he would "proceed on to the appellate proceedings,"[7] he neither formally moved for an appeal within the five days allowed by law nor pursued such an appeal in any manner.

Years later, on October 1, 2001, petitioner filed with the state district court an application for post-conviction relief. That application was denied in part on October 10, 2001; however, the court ordered the state to respond to petitioner's Brady claim.[8] Petitioner then filed a writ application with the Louisiana Fifth Circuit Court of Appeal; however, that writ application was refused on February 20, 2002.[9] Apparently, no further action was taken with respect to that post-conviction application by either petitioner or the state courts.

---

[5] State v. Bailey, 713 So.2d 588, 613 (La. App. 5th Cir. 1998) (No. 97-KA-302); State Rec., Vol. V of XX.

[6] State v. Bailey, 723 So.2d 971 (La. 1998) (No. 98-K-1458); State Rec., Vol. VII of XX.

[7] State Rec., Vol. IX of XX, transcript of June 19, 1998, p. 64.

[8] State Rec., Vol. IX of XX, Order dated October 10, 2001. See Brady v. Maryland, 373 U.S. 83 (1963).

[9] State v. Bailey, No. 02-KH-43 (La. App. 5th Cir. Feb. 20, 2002) (unpublished); State Rec., Vol. IX of IX.

However, in reviewing the record in connection with petitioner's writ application concerning the post-conviction application, the Louisiana Fifth Circuit Court of Appeal noted that the record did not reflect that the trial court had conducted the evidentiary hearing ordered in 1998. Accordingly, on February 15, 2002, the Louisiana Fifth Circuit Court of Appeal again ordered that such a hearing be conducted.[10]  Although that ruling was erroneous, in that the hearing had in fact been held on June 19, 1998, the state district court apparently held another evidentiary hearing before a different judge on March 18, 2002, and relief was again denied.[11]  On December 11, 2002, the Louisiana Fifth Circuit Court of Appeal affirmed the district court's judgment.[12]  The Louisiana Supreme Court then denied a related writ application on May 2, 2003.[13]

On April 30, 2004, petitioner filed with the state district court another application for post-conviction relief.[14]  That application was denied on July 13, 2004.[15]  Petitioner's counsel filed with the state district court a notice of intent to seek writs, and he was granted until August 13, 2004, to file his writ application.[16] After that deadline expired, petitioner's counsel, on August 16, 2004,

---

[10]   State v. Bailey, No. 02-KH-43 (La. App. 5th Cir. Feb. 15, 2002) (unpublished); State Rec., Vol. IX of XX.

[11]   State Rec., Vol. XIX of XX, transcript of March 18, 2002; State Rec., Vol. IX of XX, minute entry dated March 18, 2002.

[12]   State v. Bailey, No. 02-KA-591 (La. App. 5th Cir. Dec. 11, 2002) (unpublished); State Rec., Vol. I of XX.

[13]   State v. Bailey, 842 So.2d 1098 (La. 2003) (No. 2003-K-0114); State Rec., Vol. I of XX.

[14]   State Rec., Vol. IX of XX.

[15]   State Rec., Vol. XI of XX, Order dated July 13, 2004.

[16]   State Rec., Vol. XI of XX.

- 4 -

filed with the state district court a motion for an extension of time to seek supervisory writs.[17] Despite the fact that the motion was untimely, in that the deadline had already expired, the trial court nevertheless granted the extension.[18]  Within that improperly extended deadline, petitioner filed his writ application with Louisiana Fifth Circuit Court of Appeal.  On September 13, 2004, the Court of Appeals held that, because the extension was invalid, the writ application was untimely; however, out of an abundance of caution, the court also addressed the claims presented and denied relief.[19] Petitioner then filed with the Louisiana Supreme Court a petition for a writ of certiorari[20] which was denied on February 18, 2005.[21]

On February 17, 2006, petitioner, through counsel, filed this federal application for *habeas corpus* relief.[22]  In support of his application, he raises the following claims:

1.  Petitioner's convictions were based on evidence obtained pursuant to an illegal search and seizure; and

2.  The prosecution wrongly withheld criminal background information on one of the state's witnesses.

---

[17]  State Rec., Vol. X of XX.

[18]  State Rec., Vol. XI of XX.

[19]  State v. Bailey, No. 04-KH-996 (La. App. 5th Cir. Sept. 13, 2004) (unpublished); State Rec., Vol. X of XX.

[20]  State Rec., Vol. X of XX.

[21]  State v. Bailey, 896 So.2d 27 (La. 2005) (No. 2004-KP-2507); State Rec., Vol. XX of XX.

[22]  Rec. Doc. 1.

The state argues that petitioner's federal application is untimely.[23] The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for the filing of federal *habeas corpus* applications.  The method for calculating a petitioner's one-year period is set forth in 28 U.S.C. § 2244(d)(1), which provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

The state contends that the applicable subsection in the instant case is § 2244(d)(1)(A), a contention which petitioner does not dispute.  Assuming that § 2244(d)(1)(A) is the applicable provision, the Court finds that petitioner's federal application is in fact untimely under that provision.

Although the procedural history of the instant case is, at best, peculiar, the Court agrees with the state's contention that petitioner's convictions and sentences became final for

---

[23]  Rec. Doc. 5, pp. 12-17.

AEDPA purposes no later than ninety (90) days after the Louisiana Supreme Court's judgment in

No. 98-K-1458, when his period expired for seeking a writ of certiorari from the United States

Supreme Court.  See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d

510, 513 (5th Cir. 1999); Chester v. Cain, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D.

La. Oct. 15, 2001); see also U.S. Sup. Ct. R. 13(1).   Because the Louisiana Supreme Court's

judgment was rendered on October 30, 1998, the statute of limitations commenced in this case on

January 28, 1999.

Out of an abundance of caution, the Court notes that it rejects the premise that the

statute of limitations was "restarted" as a result of the evidentiary hearing held on March 18, 2002,

and the related appellate court proceedings.  As noted, petitioner's convictions and sentences had

already become final years before, at which time the AEDPA's statute of limitations had properly

commenced.  Once commenced, the limitations period could only be tolled, not restarted.  The

United States Fifth Circuit Court of Appeals has held:

> On its face, AEDPA provides for only a *linear* limitations period, one
> that starts and ends on specific dates, with only the possibility that
> tolling will expand the period in between.  See § 2244(d)(1), (2).  *So*
> *long as the petitioner is being held pursuant to the same state court*
> *judgment, nothing in AEDPA allows for a properly initiated*
> *limitations period to be terminated altogether by collateral state*
> *court action.  Rather, the statutory framework only provides for the*
> *tolling of limitations during the pendency of state collateral review.*
> *See* § 2244(d)(2).

Salinas v. Dretke, 354 F.3d 425, 429-30 (5th Cir. 2004) (emphasis added).  In the instant case, there

is no question that petitioner is still being held pursuant to the original state court judgment, in that

neither his convictions nor sentences were altered in any way as a result of the proceedings in 2002

and thereafter.   Accordingly, those proceedings had no affect on the statute of limitations'
commencement date.

      For the foregoing reasons, the Court finds that the statute of limitations commenced
in the instant case on January 28, 1999, and expired one-year later on January 28, 2000, unless that
deadline was extended through tolling.

      The Court first considers statutory tolling.  The AEDPA provides that the statute of
limitations is tolled for the period of time during which a properly filed application for state post-
conviction relief or other collateral review attacking a conviction or sentence is pending in state
court.  28 U.S.C. § 2244(d)(2).  However, petitioner had no applications pending before the state
courts at any time between January 28, 1999, and January 28, 2000.  Although he subsequently filed
post-conviction applications in 2001 and 2004, those filings are of no consequence in these federal
proceedings because the statute of limitations had already expired.  See Scott v. Johnson, 227 F.3d
260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4, aff'd,
253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2
(E.D. La. June 27, 2000).  Similarly, the subsequent proceedings relating to the evidentiary hearing
are irrelevant, in that they also occurred after the limitations period had expired and altered neither
petitioner's convictions nor sentences.

      The Court also notes that the United States Fifth Circuit Court of Appeals has held
that the AEDPA's statute of limitations can, in rare and exceptional circumstances, be equitably
tolled.  See Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998).  However, "[e]quitable tolling
applies principally where the plaintiff is actively misled by the defendant about the cause of action

or is prevented in some extraordinary way from asserting his rights." Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir. 1999) (internal quotes and citations omitted).   This Court knows of no reason that would support equitable tolling of the statute of limitations regarding petitioner's federal application for *habeas corpus* relief.

Because petitioner is entitled to neither statutory tolling nor equitable tolling, his federal application for *habeas corpus* relief had to be filed on or before January 28, 2000, in order to be timely.  Because his federal application was not filed until February 17, 2006, it is untimely.

Nevertheless, should the United States District Judge determine that petitioner's federal application was in fact timely filed, the undersigned, in the interest of judicial economy, will note that the application is also subject to dismissal as meritless.

Standard of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeals summarized the facts of this case as follows:

> On December 2, 1992, Marie Jones (Jones) was stopped at the New Orleans International Airport, located in Kenner, Louisiana, by Sergeant Glen Davis (Sgt. Davis). Sergeant T. Miller (Sgt. Miller), employed with the Jefferson Parish Sheriff's Office (JPSO) and assigned to investigate defendant, was called to the airport after Jones was detained. A search warrant was eventually issued for Jones' luggage, and when Sgt. Miller arrived at the narcotics office at the airport, a search of her luggage was underway. Jones was carrying $168,910 in cash. Blocks of cash were wrapped in rubber bands, fabric softener and covered in cellophane paper. She was also carrying several pieces of paper with various names, telephone numbers and addresses written on them, as well as a black address

book.  The police investigated the names, numbers and addresses found on her and learned that they referred to defendant, Dwayne Rodriguez (Rodriguez), and Daniel Swann (Swann).[FN1]   The address book contained phone numbers for Rodriguez and his girlfriend. Jones was not arrested and was allowed to go.

> [FN1] Defendant was indicted along with five co-defendants: Dwayne Rodriguez (Rodriguez), Daniel Swann (Swann) and Brennan Lowe (Lowe), who have also appealed to this court (97-KA-204, 97-KA-181 and 97-KA-501), and Dennis Kemp (Kemp) and Alfonse Olivaries (Olivaries), who have not appealed.

Thereafter, with the information obtained from the Jones search, records for Store All storage unit # 1188 at 6827 Lapalco Boulevard, Harvey, Louisiana, were subpoenaed.  Although the unit was rented to Una Taylor (Taylor), she testified that defendant asked her to rent it for him.  Cameras were placed in the hallways near the particular storage unit rented to Taylor.  The police also obtained a subpoena for the Stor All system records, which reflected every time the unit was accessed.  On December 14, 1992, pursuant to a search warrant that Sgt. Miller had obtained, the Stor All unit was searched. Three suitcases were found in this unit, one of which contained seven packages of cocaine wrapped in cellophane.

Thereafter, Sgt. Miller obtained several other search warrants for various addresses associated with defendant.  The search warrants were executed simultaneously on December 14, 1992.  Defendant was arrested pursuant to a warrant executed while the search of 3620 Delaware Street was underway.  The arresting officer testified that he read defendant his rights when he arrested him.

Jones was arrested in January of 1994.  In February of 1994, Pete Labyzon (Labyzon) was also arrested.  Pursuant to plea agreements, both Jones and Labyzon agreed to cooperate with authorities.  Jones met with police officers on numerous occasions, providing them with information on various hotels and telephone numbers allegedly involved in the charged offenses.

Once Jones identified particular hotels where she had stayed, the hotel records, receipts and telephone records were subpoenaed. Such records corroborated much of what she told the police.

On April 21, 1994, a grand jury for Jefferson Parish indicted defendant on one count of racketeering, in violation of La. R.S. 15:1351, et seq., and nine counts of distribution of cocaine and/or

possession of cocaine with the intent to distribute, in violation of La. R.S. 40:967(A).  On May 25, 1994, defendant was arraigned and he pled not guilty to all counts.

A motion for preliminary hearing was denied by the trial court on January 25, 1995.  On the same date, the trial judge took up the motions to suppress evidence as to several homes and the Stor All storage unit, a motion to suppress the evidence taken from Jones at the airport and a motion to suppress the information gathered with the pen register.  All of the motions were denied on January 26, 1995.  On January 27, 1995, the trial court denied the defense's motion for a severance of the defendants.

On January 31, 1995, the Supreme Court denied review of the writ applications.  State v. Olivares, 95-0278 (La. 1/31/95), 649 So.2d 395.  On January 31, 1995, the defendants' trial began and continued until February 13, 1995, when the defense moved for a mistrial as to all defendants.  The mistrial was granted as to defendants, Swann, Rodriguez, Kemp and Olivaries on February 14, 1995.

On April 17, 1995, the state moved to sever defendant from the others, and jury selection began in defendant's second trial.  Trial continued until April 21, 1995, when the state announced that one of its witnesses, Neumba Davison, was going to be arrested for perjury.  The District Attorney explained that Ms. Davison had an "outstanding attachment."  The trial judge refused to set bond.

Trial continued until the afternoon of April 27, 1995, when the twelve person jury returned guilty verdicts to one count of racketeering, seven counts of attempted possession of cocaine, one count of distribution of cocaine, and one count of attempted distribution of cocaine.  The jury was polled, and the trial judge announced that the verdict was unanimous.

At trial, the following testimony and facts were presented.  Jones testified for the state against defendant.  She stated that Rodriguez initially approached her and requested that she fly to Louisiana.  She made nine trips to Louisiana, arriving with cocaine and leaving with money.  These nine trips formed counts two through ten of the indictment.

She testified that during the middle of October of 1992, she began transporting cocaine to New Orleans and she continued to do so until December 2, 1992.  She specifically remembers December 2, 1992, because that was the day that she was carrying approximately $170,000 in cash and she was stopped in the New Orleans International Airport.  She stated that during each of her trips to New Orleans, she transported approximately ten, thirteen or twenty

kilograms of cocaine per trip. On her return trips, she transported blocks of cash back to Rodriguez in California. She explained that she worked for Rodriguez, who was the organizer in California, and explained that Swann, Kemp, Lowe and Olivaries were also involved with Rodriguez. She testified that the purchaser of the cocaine was defendant.

Jones testified that Swann and Lowe were responsible for exchanging the suitcases of cocaine for the suitcases of money once she had arrived in New Orleans. She explained that she had picked up the cocaine from Kemp's home in California. Kemp was also responsible for being available for telephone calls. She again testified that defendant was the buyer of the cocaine. She explained that she first got involved because Rodriguez approached her in California and asked her to work with him, transporting cocaine by airplane.

Thereafter, Jones described the nine trips that she made to Louisiana. Specifically, she testified that on her first trip, she knew cocaine was in the suitcase because she had broken the suitcase's lock and looked inside. Lowe and Swann came to her hotel room to retrieve the suitcase of cocaine and told her to "hurry up because Curtis [Bailey] was waiting." They left her hotel room, returning within approximately an hour with another suitcase. The men called Rodriguez, who instructed them to open the suitcase and check to see that all the money was there. The men opened the suitcase in front of Jones and she saw that it contained blocks of money. Thereafter, Jones flew back to California with the suitcase of money and she took it to Rodriguez.

Jones stated that prior to her fourth trip, Olivaries dropped off a box of ten kilograms of cocaine to her at her home in California. She wrapped up the cocaine, put it in her suitcase and again flew to New Orleans. When Lowe and Swann came to her hotel room to pick up the suitcase of cocaine, they again were in a hurry, telling her that defendant was waiting. The two men left her hotel room, only to return within approximately an hour to give her another suitcase. Jones testified that two large blocks of money were in the suitcase that Swann and Lowe brought to her. She flew home to California, and Rodriguez picked up the money from her at her home.

Jones testified that before she made her fifth trip to New Orleans, Rodriguez directed her to pick up the cocaine from Kemp's house. She picked up the ten blocks of cocaine, wrapped them and put them into her suitcase. Swann and Lowe were supposed to come to her hotel room to pick up the suitcase, but they never called her.

Rodriguez gave Jones a phone number and instructed her to call defendant. She called the phone number and asked Marie Bailey to put defendant on the phone. Thereafter, Jones spoke to defendant, telling him that she could not find Swann or Lowe. He told her that he would try to find them. Approximately an hour later, Swann and Lowe arrived at her hotel room, whereupon Jones gave them the suitcase of cocaine. The two men returned within the hour, giving Jones another suitcase, which she testified contained two and a half blocks of money.

Jones made her sixth trip to New Orleans with a suitcase of cocaine. She testified that Swann was not in New Orleans on this trip, but that Lowe and defendant came to her hotel room. When Lowe took the suitcase of cocaine, he handed her another suitcase. Thereafter, Lowe left and Jones and defendant remained in her hotel room, talking about defendant's Rolex watch. The defendant left her hotel room, but returned a couple of hours later with a bottle of Dom Perignon champagne. However, Jones' flight the next morning was early and she did not feel like having a drink, so defendant left her hotel room. Jones flew back to California with the money, which she gave to Rodriguez. She testified that she told Rodriguez that defendant had made an advance on her and advised Rodriguez that he needed to talk to "home boy."

Jones testified that on one of her later trips, she went to defendant's house. Once, Olivaries dropped off ten kilograms of cocaine and Jones again flew to New Orleans with it packed in a suitcase. Upon her arrival at her hotel, she called Rodriguez, who advised her that she had to meet with defendant. She called defendant at his home and he gave her the address where he wanted to meet. Jones could not remember if the address was Delaware Street, but she remembered that she had written the address on a piece of paper from the Ramada hotel. The district attorney showed her State Exhibit number 42, which she identified as the piece of paper on which she had written the address. The exhibit reflected the address 3620 Delaware Street, apartment B, as well as a phone number associated with defendant.

Jones testified that after speaking with defendant, she took a cab to the address that he had given her. Upon reaching the house, Jones and Lowe knocked on the door. Defendant opened the door and let them inside. Jones had the suitcase of cocaine with her when she went into defendant's house. Defendant was wrapping the money in blocks and Jones helped him finish. Thereafter, the two switched suitcases. Jones took the suitcase of money and defendant took the

suitcase of cocaine.  Jones flew back to California with the suitcase of money, which she gave to Rodriguez.

Jones testified that during her last trip, she transported ten kilograms of cocaine to New Orleans.  Upon arriving at her hotel, she called Rodriguez, who gave her a phone number and advised her to call it.  She called the number and defendant answered the phone.  Defendant gave her an address where they would meet each other.  Jones took a cab to the address, which she remembered was on Dimarco Street.  Upon arriving at the address, defendant let her inside with the suitcase of cocaine.  Again, she helped defendant wrap the money in blocks.  She testified that while she was in the house, she saw money on a table and cocaine in a bag that was sitting on the floor.  When she left the house, she left the suitcase of cocaine with defendant and took a suitcase of money with her.  After she arrived at the airport, purchased her plane ticket to California and sat down to eat some breakfast, a narcotics detective sat down next to her.

Jones testified that the detective approached her and said that he was not accusing her of having any drugs, but asked her if she'd mind if he looked in her bags.  She remembered Rodriguez's advice and told the officer that he had to get a search warrant first.  She explained that a warrant was obtained and her bags were searched.  The money that she had gotten from defendant was seized, as were various pieces of paper.

Pete Labyzon (Labyzon) testified that sometime in September or October of 1992, he spoke with Rodriguez and Swann on the phone, because they had called his house requesting to speak with his brother.  When Labyzon told them that his brother was not there, the men asked him whether he knew defendant.  He testified that he told the two men that although he didn't know defendant, he could get in touch with him because he knew Marie Bailey, defendant's sister.  A few days later, defendant's sister picked up Labyzon in her car and the two met with Lowe and Swann at the Piccadilly Cafeteria on Carrollton Avenue.  Labyzon testified that, while the group was eating lunch, defendant arrived at the restaurant.  According to Labyzon, defendant and Swann left the restaurant, returning approximately twenty to thirty minutes later.

Labyzon also testified that approximately a week or so after this first meeting, Lowe and Swann again called him, informing him that they were back in New Orleans and requesting that he drive them around the city.  Labyzon picked up Rodriguez, Lowe and Swann.  Labyzon said that the men told him that they were "down here to

meet with Curtis." However, Labyzon also testified that he had never delivered any drugs to defendant, seen anyone else deliver any drugs to defendant or heard defendant talking about drugs.

Defendant testified on his own behalf. Although he admitted that he had asked Taylor to rent the Stor All unit on Lapalco Boulevard for him, he denied that he had ever placed any drugs in the storage unit. He further denied any knowledge that any drugs were stored in the unit. He claimed that a man named Coleman was actually using the storage unit during December of 1992. He admitted to having lunch with Labyzon, Lowe, Swann and his sister at the Piccadilly on Carrollton Avenue. This was the first time that he met Lowe and Swann. He explained that he and Swann left the Piccadilly to get a daiquiri. He denied that he had seen any cocaine nor had anything to do with any cocaine during the time periods alleged in the indictment. He denied that he had ever met Jones and that he had never received any cocaine from her. He claimed that Jones had lied to the police.

During cross-examination, he admitted his previous conviction for possession of cocaine. He again denied that he had ever made any arrangements with Swann regarding cocaine. He denied knowing Rodriguez and stated that he had never called Rodriguez. He admitted that he had called Dimitri Swann, because he had dated her. He admitted that he knew Kemp and that he had called Kemp's house, but explained that he had called to speak to Dimitri Swann, because she was living there. He claimed that Officer Miller was lying regarding the statement that he allegedly gave, wherein he denied knowing any of the people whose names were listed on the indictment.[24]

## Illegal Search and Seizure

Petitioner's first claim is that his convictions were based on evidence obtained pursuant to an illegal search and seizure. Specifically, petitioner contends that after trial it was learned that the Stor All storage unit was in fact illegally searched prior to the issuance of the search warrant.

---

[24] State v. Bailey, 713 So.2d 588, 592-95 (La. App. 5th Cir. 1998) (No. 97-KA-302); State Rec., Vol. V of XX.

On May 30, 1995, after the verdict but before sentencing, defense counsel informed the trial judge that "new evidence" had been discovered indicating that the storage unit was searched prior to the issuance of the search warrant.  Defense counsel filed a motion for new trial based on that evidence and requested a continuance for additional time to corroborate the newly discovered evidence.  The trial court denied both the motion for new trial and the continuance.[25]  Defense counsel appealed, and the Louisiana Fifth Circuit Court of Appeal found no error with respect to that ruling, holding:

> Defendant argues that the trial court erred in denying his motion to continue sentencing so that he could have time to investigate facts that had just come to his attention to support his motion for new trial.
> The state counters that the facts defense counsel wanted to investigate, specifically, the tapes to the Stor All unit, were available to him throughout the trial and was not new evidence that had only recently come to his attention.
> La.C.Cr.P. art. 853 provides in pertinent part:
>
> > A motion for a new trial must be filed and disposed of before sentence.  The court, on motion of the defendant and for good cause shown, may postpone the imposition of sentence for a specified period in order to give the defendant additional time to prepare and file a motion for a new trial.
>
> In State v. Bourque, 622 So.2d 198, 224 (La. 1993), speaking on the standard of review of a trial court's denial of a motion for continuance, the Louisiana Supreme Court stated as follows:
>
> > "The granting or refusal of a motion for a continuance rests within the sound discretion of the trial judge." State v. Simpson, 403 So.2d 1214, 1216 (La. 1981). This ruling will not be disturbed absent a clear abuse

---

[25]  State Rec., Vol. XVIII of XX, transcript of May 30, 1995.

of discretion.  State v. Washington, 407 So.2d 1138, 1148 (La. 1981); Simpson, 403 So.2d at 1216.  Whether a refusal is justified depends on the circumstances of the case.  In general, this court has declined to reverse a conviction based on the denial of a motion for continuance absent a showing of specific prejudice.  Id.

Applying these precepts to the instant case, we find no showing that the trial court abused his discretion in the denial of defense counsel's request for a continuance.  Defense counsel stated that he had only two days earlier discovered evidence that led him to believe that the state had searched the Stor All unit prior to obtaining a warrant.  The defense wanted the sentencing continued for three days to allow him to review video tapes of the entry to the Stor All units.  However, the state countered with argument that defendant had previously been aware of the witness in question and his whereabouts, and the defense had years within which they could have viewed the video tapes to the Stor All units.  Thus, the trial court determined that the defense had not shown good cause for the continuance.  We find no abuse of discretion in that ruling.
This assignment of error has no merit.[26]

The Louisiana Supreme Court then denied a related writ application without assigning reasons.[27]

Petitioner then asserted the instant claim in his first post-conviction application filed in 2001.  In rejecting the claim, the state district court held:

Counsel for defendant raised this issue in open court after petitioner's trial but prior to sentence at which time the trial court admonished counsel for failing to raise it in a motion to suppress and counsel stated he would raise it in a motion for new trial.  This is not newly

---

[26]  State v. Bailey, 713 So.2d 588,  609-10 (La. App. 5th Cir. 1998) (No. 97-KA-302); State Rec., Vol. V of XX.

[27]  State v. Bailey, 723 So.2d 971 (La. 1998) (No. 98-K-1458); State Rec., Vol. VII of XX.

> discovered evidence.  Defendant could have easily raised this issue
> ... in defendant's appeal, but failure to do so results in a waiver.[28]

Petitioner sought review of that decision by filing a writ application with the Louisiana Fifth Circuit

Court of Appeal; however, that Court of Appeal erroneously dismissed the application as premature

based on a mistaken finding that petitioner's convictions were not yet final.[29]  Petitioner did not seek

review of that judgment by the Louisiana Supreme Court.

Petitioner then again asserted the claim in his second post-conviction application in

2004.  The state district court again rejected the claim, holding:

> [D]efendant alleges that the evidence presented at trial was based on
> warrants issued after the illegal search of the Stor All facility.
> Defendant claims that Officer Miller directed and caused another
> officer and Donald Coleman to enter defendant's, Curtis Bailey,
> storage facility without a warrant, thus violating Bailey's Fourth
> Amendment right.  In its response, the State maintains that this same
> issue was previously raised by the defendant during a Pretrial Motion
> to Suppress Evidence, Motion for New Trial, and in his first
> application for post-conviction relief.
>
> To reiterate and give yet another overview of the procedural
> history of this case would be a grievous waste of this Court's time
> and effort.  In short, on January 25, 1995, the trial judge took up the
> Motions to Suppress Evidence as to several homes and the Stor All
> storage unit.  All of the motions were denied on January 26, 1995.  It
> should be noted that the Fifth Circuit, Court of Appeal, No. 97-KA-
> 302, found that the trial court appropriately denied defendant's
> motion to suppress.  On April 18, 1995, the allegation of the
> warrantless search of the Stor All facility was raised by defense
> counsel in open court.  On April 19, 1995, the trial court held a
> Motion to Suppress Evidence hearing on this very issue based on
> newly discovered evidence.  The defendant then filed a Motion to

---

[28]   State Rec., Vol. IX of XX, Order dated October 10, 2001.

[29]   State v. Bailey, No. 02-KH-43 (La. App. 5th Cir. Feb. 15, 2002) (unpublished); State Rec., Vol.
IX of XX.  See supra notes 10-11 and accompanying text.

> Continue Sentencing based on new information to support a Motion for New Trial alleging that the State searched the Stor All unit prior to obtaining a warrant. The trial court denied his request on May 30, 1995. Again, the Fifth Circuit, No. 97-KA-302, found no abuse in the trial court's discretion regarding this ruling. Finally, defendant filed his first post-conviction relief application which addressed this very matter. On October 10, 2001, defendant's claim was found to be without merit and the court found it was not newly discovered evidence. Thus, defendant's attempts are denied as repetitive and *res judicata*.[30]

The Louisiana Fifth Circuit Court of Appeal held petitioner's related writ application was untimely filed. However, "in an abundance of caution and the interest of judicial efficiency," the Court of Appeal alternatively denied the claim as repetitive, holding:

> [R]elator argues that the trial judge erred in denying the claim that his conviction was unconstitutional because it was based on evidence obtained from an illegal search. We find no error in the trial court's denial of relief on the grounds that the issue was fully litigated on appeal and examined in a previous application for post conviction relief. La. C.Cr.P. art. 930.4.[31]

The Louisiana Supreme Court then denied a related petition for a writ of certiorari without assigning reasons.[32]

In <u>Stone v. Powell</u>, 428 U.S. 465 (1976), the United States Supreme Court held: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence

---

[30]  State Rec., Vol. XI of XX, Order dated July 13, 2004.

[31]  <u>State v. Bailey</u>, No. 04-KH-996 (La. App. 5th Cir. Sept. 13, 2004) (unpublished); State Rec., Vol. X of XX.

[32]  <u>State v. Bailey</u>, 896 So.2d 27 (La. 2005) (No. 2004-KP-2507); State Rec., Vol. XX of XX.

obtained in an unconstitutional search and seizure was introduced at trial." Id. at 494 (footnote omitted); see also Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002). The Stone bar applies even if the state court rulings regarding the Fourth Amendment claims were in fact erroneous. Swicegood v. Alabama, 577 F.2d 1322, 1324 (5th Cir. 1978).

   In the instant case, the state's response addressed only the timeliness of petitioner's federal application. Therefore, the state has not raised the Stone bar. Nevertheless, the undersigned, through this Report and Recommendation, hereby places petitioner on notice that the Stone bar is being invoked *sua sponte*.[33]

> Interpreting Stone, the United States Fifth Circuit Court of Appeals has clearly held:
>
> An "opportunity for full and fair litigation" means just that: an opportunity. If a state provides the *processes* whereby a defendant *can* obtain full and fair litigation of a fourth amendment claim, Stone v. Powell bars federal habeas corpus consideration of that claim *whether or not the defendant employs those processes*.

Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978) (emphasis added). The Stone bar applies in those cases where no motion to suppress was ever filed. Id. at 1192-93.

   In the instant case, petitioner argues that he was never afforded a full and fair opportunity to present his Fourth Amendment claim because he learned of the underlying facts to support that claim only days before sentencing. The state courts were unmoved by that contention, essentially finding that, with more diligence, the "new evidence" could have been discovered years earlier. It is evident that the state courts were loath to give defense counsel a second bite at the apple

---

[33] The United States Fifth Circuit Court of Appeals has held that the Stone bar may be raised *sua sponte*. Davis v. Blackburn, 803 F.2d 1371, 1372-73 (5th Cir. 1986).

a few weeks after the adverse verdict when he miraculously discovered this previously discoverable evidence.

Whether the state courts' decision on that matter in this particular case was "right" or "fair" is immaterial.  The United States Fifth Circuit Court of Appeals has noted that the <u>Stone</u> bar applies even where a defendant in a particular case attempts to litigate a Fourth Amendment claim but the state court erroneously refuses to consider that claim, holding:

> [I]n the absence of allegations that the *processes* provided by a state to fully and fairly litigate fourth amendment claims are *routinely or systematically* applied in such a way to prevent the actual litigation of fourth amendment claims on the merits, the rationale of <u>Caver</u> dictates that <u>Swicegood</u>'s application of <u>Stone</u> despite a mistake in adjudicating the merits must apply with equal force to procedural mistakes that thwart the presentation of fourth amendment claims.

<u>Williams v. Brown</u>, 609 F.2d 216, 220 (5th Cir. 1980) (emphasis added); <u>see also</u> <u>Janecka</u>, 301 F.3d at 321 ("[A]bsent additional allegations that state processes routinely or systematically are applied in such a way as to prevent the actual litigation of Fourth Amendment claims, mistakes that thwart the presentation of Fourth Amendment claims do not render the <u>Stone</u> bar inapplicable.").

It is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise Fourth Amendment claims.  In the instant case, petitioner does not even allege, much less demonstrate, that Louisiana state courts routinely or systematically preclude litigation of claims such as the ones he now raises.  Where, as here, there are insufficient factual allegations and proof that the state process is routinely or systematically applied in such a way as to prevent the actual litigation of such claims, the <u>Stone</u> bar applies.

<u>Brady Claim</u>

Petitioner next argues that the prosecution wrongly withheld criminal background information on Andrew Chambers, one of the state's witnesses, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.  "Whether documents must be produced and whether they are material under <u>Brady</u> is a mixed question of law and fact."  <u>Trevino v. Johnson</u>, 168 F.3d 173, 184 (5th Cir. 1999).  Therefore, this Court is required to defer to the state court's decision rejecting petitioner's <u>Brady</u> claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

The state district court rejected petitioner's claim, holding:

> [T]he defendant's allegations that the State withheld the criminal background pertaining to Andrew Chambers was previously addressed by the State in its response to the application for post-conviction relief filed on behalf of co-defendant, Dwayne Rodriguez. Upon review, Andrew Chambers had arrests but not convictions for assault, forgery, false financial statement, disturbing the peace, larceny, insufficient funds, soliciting prostitution, and impersonating an officer in various different states in the period of 1984 to 1995. On February 3, 2000, the U.S. Attorney Janet Reno issued an order banning Andrew Chambers from participating in any future undercover investigation. All of these acts of perjury discussed in that order occurred from 1998 to 2000, three years after the defendant's trial in 1995. The State had no knowledge of the witness' future perjury because they had not yet occurred, hence no Brady violation occurred. The court agrees that no Brady violation where the state had no knowledge of prior arrests in various other states. Thus, the defendant is not entitled to the relief sought.[34]

---

[34] State Rec., Vol. XI of XX, Order dated July 13, 2004.

The Louisiana Fifth Circuit Court of Appeal held petitioner's related writ application was untimely filed. However, "in an abundance of caution and the interest of judicial efficiency," the Court of Appeal alternatively denied the claim on the merits, holding:

> [R]elator argues that the trial judge erred in denying his claim that the State withheld criminal background information on Andrew Chambers, its confidential informant in this case. After reviewing the State's opposition and the trial judge's well-reasoned judgment, we find no error in the trial court's denial of relief on [this] claim.[35]

The Louisiana Supreme Court then denied a related petition for a writ of certiorari without assigning reasons.[36]

> Regarding <u>Brady</u> claims, the United States Fifth Circuit Court of Appeals has stated:
>
> <u>Brady</u> requires the state to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.
>       Under <u>Brady</u>, to establish that the state has breached this duty, the defendant must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment. This duty extends to both exculpatory and impeachment evidence.

<u>DiLosa v. Cain</u>, 279 F.3d 259, 262-63 (5th Cir. 2002) (internal quotation marks and citations omitted).

> As to the incidents of alleged perjury, the state courts found that the perjury occurred

*after* petitioner's trial and conviction. This Court agrees that <u>Brady</u> cannot be extended so far as to

---

[35] <u>State v. Bailey</u>, No. 04-KH-996 (La. App. 5th Cir. Sept. 13, 2004) (unpublished); State Rec., Vol. X of XX.

[36] <u>State v. Bailey</u>, 896 So.2d 27 (La. 2005) (No. 2004-KP-2507); State Rec., Vol. XX of XX.

require disclosure of *future* events.  Although prosecutors are expected to perform their duties ethically as officers of the court, they are not expected to be prescient.

As to Chambers' prior arrests, the state courts found that the prosecutors were not aware of those arrests.  Under the law of this federal Circuit, that fact alone would not necessarily suffice.  The United States Fifth Circuit Court of Appeals has held that a prosecutor's <u>Brady</u> obligations extend even to evidence unknown to him if it was available to him through such methods as running an FBI or NCIC check.  <u>See</u> <u>United States v. Auten</u>, 632 F.2d 478, 481 (5th Cir. 1980).  Moreover, under the law of this federal Circuit, it would not necessarily be dispositive that a criminal background check would have revealed, at most, only *arrests* rather than *convictions*.  Although evidence of prior arrests is inadmissible to impeach a witness under Louisiana law,[37] the United States Fifth Circuit Court of Appeals has held that a prosecutor's <u>Brady</u> obligations extend even to the disclosure of evidence that would be inadmissible at trial.  <u>See</u> <u>United States v. Lee</u>, 88 Fed. App'x 682, 685 (5th Cir. 2004).

However, federal *habeas* relief cannot be granted merely because a state court's decision is contrary to jurisprudence of the *United States Fifth Circuit Court of Appeals*.  Rather, as the Court of Appeals has noted, under the "contrary to" clause of 28 U.S.C. § 2254(d)(1), a federal court may grant habeas relief only when the state court has arrived at a conclusion opposite

---

[37] La. Code Evid. art. 609.1(B) ("Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal."); <u>State v. Johnson</u>, 664 So.2d 94, 99 (La. 1995) ("Evidence regarding previous arrests, indictments, prosecutions or other criminal proceedings not resulting in convictions is prohibited.").

to that reached by the *United States Supreme Court* on a question of law or if the state court decides a case differently than the *Unites States Supreme Court* has on a set of materially indistinguishable facts. Jordan v. Dretke, 416 F.3d 363, 368 (5th Cir. 2005) (citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000)). In the instant case, petitioner has not demonstrated a direct conflict between the state court's denial of relief and controlling *United States Supreme Court* jurisprudence.

Moreover, this Court does not find that petitioner's claim fares any better under the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1). Under that clause, it is not sufficient that this Court, in its independent judgment, might find that the state court's application of Brady was erroneous. "Rather, when a state court's application of federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." Jordan, 416 F.3d at 369 (internal quotation marks omitted). In the instant case, this Court simply cannot say that the state courts' decisions regarding petitioner's Brady claim were objectively unreasonable.[38]

---

[38] The fact that the decisions arguably conflict with Fifth Circuit precedent does not make them unreasonable, especially in light of the fact that the federal circuits are by no means of one mind on these issues. For example, the United States Eighth Circuit Court of Appeals has expressly rejected the Fifth Circuit's position that Brady imposes on prosecutors a duty to disclose evidence not in their possession, as well as the contention that prosecutors must check for criminal history information from other jurisdictions. United States v. Jones, 34 F.3d 596, 599-600 (8th Cir. 1994). Regarding what obligation, if any, prosecutors have to disclose "inadmissible evidence," there is widespread disagreement among the federal circuits in light of the United States Supreme Court's decision in Wood v. Bartholomew, 516 U.S. 1 (1995). As the United States Ninth Circuit Court of Appeals has noted:

> There is no uniform approach in the federal courts to the treatment of inadmissible evidence as the basis of Brady claims. See generally Felder v. Johnson, 180 F.3d 206, 212 & n.7 (5th Cir. 1999) (discussing various approaches taken by different circuits and collecting cases). Some circuits have held that if evidence is itself inadmissible, then it cannot be material under Brady. See, e.g., Hoke v. Netherland, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996). Others allow that inadmissible evidence can

Further, in any event, the Court finds that Chambers' arrest record does not meet Brady's materiality requirement.  The United States Fifth Circuit Court of Appeals has noted:

> Evidence is *material* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different; and such reasonable probability is a probability sufficient to undermine confidence in the outcome.

Martin v. Cain, 246 F.3d 471, 477 (5th Cir. 2001) (internal quotation marks and brackets omitted). First, even if defense counsel had been made aware of Chambers' history of arrests, that information could not have been used to impeach Chambers.[39]  Second, as noted in the state's response to petitioner's state post-conviction application,[40] Chamber's testimony was essentially cumulative of that of other witnesses and was hardly critical in this case.  Chambers was a minor witness, whose entire testimony is recorded in a mere eighteen pages of the transcript.  Defense counsel did not even bother to cross-examine Chambers.[41]  Therefore, defense counsel's inability to attempt to discredit Chambers' testimony is insufficient to undermine confidence in the trial's outcome.

---

be material under Brady, if it could have led to the discovery of admissible evidence. See, e.g., Wright v. Hopper, 169 F.3d 695, 703 & n.1 (11th Cir. 1999); Madsen v. Dormire, 137 F.3d 602, 604 (8th Cir. 1998).

Paradis v. Arave, 240 F.3d 1169, 1178 (9th Cir. 2001).  Further, the Fifth Circuit has to this point declined to decide whether its rule that inadmissible evidence must be disclosed is still good law in light of Wood.  Summers v. Dretke, 431 F.3d 861, 881 n.11 (5th Cir. 2005), cert. denied, 127 S.Ct. 353 (2006).

[39]  See *supra* note 37.

[40]  State Rec., Vol. XI of XX, State Response to Application for Post-Conviction Relief, p. 17.

[41]  See State Rec., Vol. XVII of XX, transcript of April 26, 1999, pp. 18-36.

For all of the foregoing reasons, the Court finds that petitioner has failed to demonstrate that the state court's decisions rejecting his <u>Brady</u> claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects that claim.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Curtis Bailey be **DISMISSED WITH PREJUDICE** as untimely and, alternatively, as meritless.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this nineteenth day of March, 2007.

**SALLY SHUSHAN
UNITED STATES MAGISTRATE JUDGE**